## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION

RODZIK LAW GROUP, PLLC; BAU PRINT
AND MAIL, INC., and CATARACT
CONSULTANTS, PA, *individually and on
behalf of others similarly situated*,

   Plaintiffs,

v.

HARTFORD CASUALTY INSURANCE
GROUP; and THE HARTFORD
FINANCIAL SERVICES GROUP, INC.

   Defendant.

**CASE NO:**

**CLASS ACTION**

**<u>JURY TRIAL DEMANDED</u>**

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs, RODZIK LAW GROUP, PLLC, ("RLG"), BAU PRINT & MAIL, INC.
("BAU") and CATARACT CONSULTANTS, PA ("Cataract Consultants") (collectively RLG,
BAU and Cataract Consultants are referred to as "Plaintiffs") individually and on behalf of all
others similarly situated, bring this Class Action Complaint against Defendants HARTFORD
CASUALTY INSURANCE GROUP ("Hartford Casualty") and THE HARTFORD FINANCIAL
SERVICES GROUP, INC ("Hartford Financial Services Group") (collectively Hartford Casualty
and Hartford Financial Services Group shall be referred to as either "Defendants" or "Hartford")
and complain and allege as follows:

## <u>NATURE OF THE ACTION</u>

1. This is a civil class action brought by Plaintiffs on behalf of consumers who
purchased a Spectrum® Business Owners Policy from Hartford and were denied coverage related
to losses incurred as a result of the curtailment of operations associated with the impact of the
Global Coronavirus pandemic, including Governmental Orders limiting business activity.

Defendants have universally denied Business Income, Extended Business Income, Business Income from Dependent Properties, and Civil Authority coverage due to COVID-19 and the resultant executive orders by civil authorities that caused the suspension of business/practice no matter the language or scope of coverage in any particular insurance policy, including the absence of an ISO Virus Exclusion that is included in most commercial property policies, including those written and issued by Hartford.

2.     The risk of a virus or pandemic like COVID-19 was foreseeable to Hartford. The current COVID-19 pandemic is, after all, the third serious coronavirus outbreak in less than 20 years, following SARS in 2002-2003 and MERS in 2012, and other recent virus epidemics or pandemics have included Ebola (2014-2016), the swine (H1N1) flu (2009-2010), Zika (2015), and various strains of the avian (or bird) flu.  As such, since 2006 over 80% of commercial property policies have contained an industry-standard provision that excludes coverage "for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."[1][2] By contrast, Plaintiffs' and Class Members' Hartford's Spectrum® Business Owner Policy do *not* contain the standard exclusion.  In contrast, the Plaintiffs' and Class Members' policies are accompanied by an endorsement, which, as explained below, does not exclude coverage from these all risk policies.

3.     Because of the presence of COVID-19 and the governmental orders issued to try to contain it, Plaintiffs and Class Members have been forced to halt or reduce their business

---

[1] National Association of Insurance Commissioners, *A Report of the NAIC on the State Insurance Regulatory Response to COVID-19, Update 1 / January 1-May 31, 2020* at pg 20, https://content.naic.org/sites/default/files/inline-files/naic_covid_19_report_1%5B1%5D.pdf (Last viewed Nov. 20, 2020).
[2] A copy of ISO's standard-form virus exclusion (Commercial Property endorsement No. CP 01 40 07 06), and the ISO's 2006 submission to state regulators introducing it, is attached as Exhibit A to this Complaint.

operations. It is not merely the risk of person-to-person transmission from large groups of people congregating that makes Plaintiffs' and Class Members' business premises unsafe. It is, in addition, the fact that the virus's presence on surfaces and objects cannot be sufficiently abated by regular cleaning or disinfecting. The combination of the risks of person-to-person transmission *and* surface-to-person transmission explains why so many government authorities issued mandatory orders not just regulating crowd size or requiring social distancing but also prohibiting access to Plaintiffs' and Class Members' properties. Plaintiffs and Class Members have been forced by civil authorities to involuntarily suspend, interrupt, or reduce their operations. As a result, they have sustained substantial losses. They have lost income. Many have furloughed workers. Most continue to have to meet substantial existing obligations and overhead.

4.      Plaintiffs seek damages and equitable remedies for themselves and for the Class (defined below). Specifically, this is an action for Declaratory Judgment pursuant to 28 U.S.C. § 2201 to determine questions of insurance coverage under a policy of insurance issued by Defendant to Plaintiffs and the Class.  This is also an action for breach of an insurance contract for Defendants' failure to pay insurance policy proceeds that were due and owing to Plaintiffs and the Class under the policy of insurance.

## **PARTIES**

5.      Plaintiff Rodzik Law Group, PLLC ("RLG") is a North Carolina Professional Limited Liability Company with its principal place of business in New Hanover County, North Carolina.  Plaintiff RLG operates a personal injury litigation practice out of two offices, one located at 2309 S 17th St, Wilmington North Carolina, and the other located at 863 Ocean Highway, Supply North Carolina (collectively "Insured Premises"). The Rodzik Law Group is the named insured on the standard-form commercial property insurance policy (22 SBA VD1074) issued by

Hartford, covering the period 07/28/19 to 07/28/20. A copy of the Policy is attached as Exhibits B-1 and B-2.

6.     Plaintiff BAU Print & Mail, Inc. is a North Carolina Corporation with its principal place of business in New Hanover County, North Carolina. Plaintiff BAU is a seminar marketing company, conducting marketing seminars for financial advisors, attorneys, and insurance agents. These seminars are held nationally in restaurants, hotels, and libraries. Typically, BAU will conduct approximately 20 seminars a week. During the week of March 16, 2020, nearly every seminar scheduled for April was cancelled by their customers. The precipitous drop has continued to date with May and June seminars off over 92-93%, July seminars off over 46%, and August and September seminars off 69% from the previous year. BAU is the named insured on the standard-form commercial property insurance policy (22 SBA UJ8226) issued by Hartford, covering the period 5/14/19 to 5/14/20 and renewed to 5/14/21. A copy of those Policies are attached as Exhibit C-1 and C-2.

7.     Plaintiff Cataract Consultants, PA is a North Carolina Professional Corporation with its principal place of business in New Hanover County, North Carolina. As its name suggests, Plaintiff Cataract Consultants provides ophthalmological services in Southeastern North Carolina and concentrates its practice on the diagnosis and surgical treatment of cataracts and related eye conditions and diseases. Throughout the COVID-19 pandemic, nearly all cataract surgeries have been considered elective surgery and have been greatly curtailed. Numerous directives and orders were issued by the Governor of North Carolina, American Academy of Ophthalmology (AAO), College of Surgeons, New Hanover Regional Medical Center, and SurgCare facilities beginning in March 2020, which resulted in a significant number of cancellations and a decline of business operations. From March 20 through June 1, 2020, Cataract Consultants was prohibited from

conducting any elective procedures or examinations. The practice's access to operating room facilities were also temporarily suspended by these directives and orders. Cataract Consultants is the named insured on the standard-form commercial property insurance policy (22 SBA BP3769) issued by Hartford, covering the period 2/22/2020 to 2/22/2021. A copy of the Policy is attached as Exhibit D.

8.     Defendant Hartford Casualty Insurance Company is an Indiana company with its principal place of business in Hartford, Connecticut. Hartford Casualty is a wholly owned subsidiary of The Hartford Financial Services Group. At all relevant times, Hartford Casualty sold and issued insurance policies in the state of North Carolina and the United States, including, without limitation, to RLG, BAU and Cataract Consultants.

9.     Defendant The Hartford Financial Services Group, Inc. is a Delaware company with its principal place of business in Hartford, Connecticut. Hartford Financial Services Group is a financial holding company for a group of insurance and non-insurance subsidiaries.

## <u>JURISDICTION AND VENUE</u>

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because Plaintiff, as well as other members of the Classes (as defined below), and Defendants are citizens of different states, and because: (a) the Classes consist of at least 100 members; (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs; and (c) no relevant exceptions apply to Plaintiff's claims.

11.     This Court has personal jurisdiction over Defendants, because a substantial portion of the alleged wrongdoing occurred in the State of North Carolina, and Defendants have sufficient contacts with the state of North Carolina.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b)(3) because a substantial portion of the acts and conduct giving rise to the claims occurred within the district.

## FACTUAL BACKGROUND

13.     COVID-19—more formally known as Severe Acute Respiratory Syndrome Coronavirus 2 (or SARS-CoV-2)—is a physical pathogen. It is spread among humans both through respiratory droplets and aerosols (when people talk, cough, or sneeze) and also—when those droplets land on objects and surfaces—by human contact with those objects or surfaces.[3] According to several studies, COVID-19 can survive for days on objects and surfaces. The CDC has reported that the virus was still detectable on a variety of surfaces on a cruise ship, inside the cabins of both symptomatic and asymptomatic infected passengers, 17 days after the cabins had been vacated.[4]

14.     The World Health Organization ("WHO"), which initially declared COVID-19 a global pandemic in March, on July 9, 2020 issued a number of responses to common questions about COVID-19.  One of these responded to the question of "How is the virus that causes COVID-19 most commonly transmitted between people?" In response, WHO also answered the question of "What are the other ways in which the COVID-19 virus could be transmitted?" by saying that: "People with the virus in their noses and throats may leave infected droplets on objects and surfaces (called fomites) when they sneeze, cough on, or touch surfaces, such as tables, doorknobs and handrails."

## A.  Civil Authorities' Response to the Property Harms Caused by COVID-19

---

[3] https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf#:~:text=COVID%2D19%20is%20primarily,nose%2C%20or%20eyes (last accessed November 10, 2020).

[4] https://www.cdc.gov./mmwr/volumes/69/wr/pdfs/mm6912e3-H.pdf (last accessed November 10, 2020).

15.     In every state in the Union, state or local government authorities and others have issued emergency declarations and orders relating to COVID-19. These orders have typically required the shut-down of all businesses deemed "non-essential." Even many businesses deemed "essential" have been severely impacted and have ceased or curtailed in-person services. Many of these civil-authority orders explicitly acknowledge the physical impacts that COVID-19 causes to property. For example:

a.  On April 30, 2020, the Governor of Illinois issued an Executive Order requiring restaurants and other facilities that prepare and serve food to prepare and serve it only for consumption off-premises, "due to the virus's propensity to physically impact surfaces and personal property."

b.  On March 25, 2020, the Colorado Department of Public Health & Environment issued a Stay at Home Order stating that "COVID-19 … physically contributes to property loss, contamination, and damage due to its propensity to attach to surfaces for prolonged periods of time" and that a Stay at Home Order was necessary "to reduce the property damage caused by COVID-19," including by minimizing "the exposure of the public to contaminated public surfaces."

c.  On March 23, 2020, the Governor of Hawaii issued a proclamation citing "the virus's propensity to physically impact surfaces and personal property" limiting restaurants and other facilities that prepare and serve food exclusively to delivery, drive-through, curbside pick-up, and carry-out.

d.  On March 22, 2020, the Governor of Louisiana issued a proclamation citing the necessity of closing certain businesses and the limiting the operations of others

"because of physical contamination of property due to its ability to attach to surfaces for prolonged periods of time."

e. On March 26, 2020, the Governor of Montana issued a Directive barring restaurants and other entities that provide food services from preparing and serving food unless for consumption "off premises," due to "the virus's propensity to physically impact surfaces and personal property."

f. On March 23, 2020, the Governor of West Virginia issued an order citing the need to close certain business and limit the operation of others "because of physical contamination of property due to its ability to remain on surfaces for prolonged periods of time" and to specifically restrict food and beverage facilities to serving and preparing food and drinks exclusively for consumption off premises "due to the virus's propensity to physically impact surfaces and personal property."

g. On March 16, 2020, the Mayor of New York City issued an Emergency Executive Order, in part "because the virus physically is causing property loss and damage" and, on April 14, 2020, an Order stating that "this Order is given because of the propensity of the virus to spread person to-person and also because the actions taken to prevent such spread have led to property loss and damage."

h. On March 22, 2020, the County Administrator of Broward County, Florida issued an Emergency Order, made "necessary," in part, the Order stated, "because the virus is physically causing property damage due to its proclivity to attach to surfaces for prolonged periods of time."

i. On April 6, 2020, the Governor of Indiana issued an Executive Order limiting entities that provide food services to the public to pick-up and takeaway services

only, "due to the virus's propensity to physically impact surfaces and personal property."

    j.    On March 16, 2020, the Mayor of New Orleans issued an Emergency Order, noting "the propensity" of COVID-19 "to attach to surfaces for prolonged periods of time, thereby spreading from surface to person and causing property loss and damage in certain circumstances."

    k.    On March 18, 2020, the Health Officer of Napa County, California issued a shelter-at-home order "based on evidence of increasing occurrence of COVID-19 throughout the Bay Area, increasing likelihood of occurrence of COVID-19 within the County, and the physical damage to property caused by the virus."

    l.    On March 19, 2020, the Mayor of Los Angeles issued a stay-at-home order, stating that "This Order is given because, among other reasons, the COVID-19 virus can spread easily from person to person and it is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time."

16.    COVID-19's impact on property has likewise been acknowledged by the federal Center for Disease Control (CDC), which has issued guidance emphasizing the spread of the virus through surface transmission and advising that "surfaces and objects in public places" therefore "should be cleaned and disinfected before *each* use." (Emphasis added).[5]

17.    As these statements from the CDC and state and local officials indicate, myriad civil authorities have consistently emphasized the direct physical impact of COVID-19 on property and the role that surface transmission can play in spreading the virus.

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html (last accessed on November 10, 2020).

18.     North Carolina authorities have been equally active in regulating business.   On March 27, 2020, Governor Roy Cooper issued an "Executive Stay at Home Order and Strategic Directions for North Carolina in Response to Increasing COVID-19 Cases," a copy of which is attached as Exhibit I.  This stay at home order was extended in April.  Since then, some restrictions have eased, but still exist.  A summary list of the North Carolina Executive Orders is attached as Exhibit J.[6]  In the Executive Order declaring a State of Emergency, on March 10, 2020, Governor Cooper cited that "COVID-19 is a respiratory disease that can result in serious illness or death by the SARS-CoV-2 virus, which is a new strain of coronavirus previously unidentified in humans and which can spread from person to person."  In a later Executive Order No. 131, issued on April 9, 2020, Governor Cooper acknowledged the necessity of additional measures to combat the spread of COVID-19 in retail businesses, "retail establishments must restrict their maximum occupancy during this emergency, must clearly mark spacing for social distancing, and must perform frequent and routine environmental cleaning and disinfection of high-touch areas."

19.     Cities across the State of North Carolina have responded to the presence of COVID-19 in their communities.  For example, among other things, on May 22, 2020, the City of Wilmington, North Carolina issued a Proclamation Declaring Continuing State of Emergency in the City of Wilmington, which is attached as Exhibit K.

20.     North Carolina County Governments have likewise responded to the presence of COVID-19.  For example, New Hanover County issued a number of Executive Orders and a summary list of those Orders is attached as Exhibit L.  In one of the first of these, the County, in Section 12, labeled "Specific Closures to Further Limit Viral Transmission-Amusement", closed all those businesses which it deemed non-essential, excluding some outside activities as long as

---

[6] Copies of each Order are available at https://www.nc.gov/covid-19/covid-19-executive-orders.

the mass gathering restrictions against groups of 10 or more and the social distancing restrictions were followed.

21.     The North Carolina judiciary has been forced to address the presence of COVID-19 in the courthouses.  For example, Cheri Beasley, the Chief Justice of the North Carolina Supreme Court, issued an Order attached as Exhibit M limiting court access and proceedings. Additional Orders are enumerated on the attached Exhibit N.  In the initial Order, issued March 13, 2020, Court proceedings were delayed for thirty (30) days.  On April 2, 2020, Chief Justice Beasley extended the ban on court proceedings until June 1,2020.  On July 16, 2020, the Chief Justice extended the prohibition on any jury trials in the State of North Carolina until at least the end of September, 2020.  These orders, the most recent of which was issued August 24, 2020, all acknowledge that catastrophic conditions resulting from the COVID-19 outbreak have existed and continue to exist throughout North Carolina.

22.     As a result of one or more orders by civil authorities, Plaintiffs and all Class Members have been forced to involuntarily suspend, interrupt, or curtail their operations.

**B.  The Insurance Industry's Response to the Property Harms Caused by COVID-19**

23.     In 2006, citing "the specter of pandemic" and specifically identifying the deadly SARS-CoV outbreak (that affected 26 countries in 2003), the ISO filed a new standard-form exclusion with state insurance regulators to address "loss due to disease-causing agents such as viruses and bacteria." Exhibit A. The ISO accompanied that submission to regulators with an explanatory statement, in which the ISO expressly acknowledged the impact of disease-causing agents on properties insured under commercial property policies, stating that: "Disease causing agents may … enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs,

potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses." See Exhibit A.

24.     Despite thus previously expressing concern to regulators that disease-causing agents such as viruses cause contamination and other loss of or damage to building surfaces, now that the insurance industry is in fact facing proliferating and sizeable claims of precisely that kind, it has changed its message. In a letter to Congressmen on April 2, 2020, the CEOs of four leading insurance industry trade organizations launched a preemptive campaign to limit COVID-19 claims, citing *financial* concerns. These four CEOs argued to Congress that although "standard commercial policies offer coverage and protection against a wide range of risks and threats and are vetted and approved by state regulators," that model, however, "cannot account for" the present situation, *"in which losses are catastrophic and nearly universal."* Exhibit E (emphasis added). In the face of mounting property claims, these executives breezily opined that the industry's policies do not cover pandemic-related losses: "Standard business interruption policies do not, and were not designed to, provide coverage against communicable diseases such as COVID-19, and as such, were not actuarially priced to do so." See Exhibit E.

25.     Hartford, for its, part, has also launched its own campaign to discourage claims. For example, in its website, Hartford states:

> **Business Interruption Coverage**
> Most property insurance includes business interruption coverage, which often includes civil authority and dependent property coverage. This is generally designed to cover losses that result from direct physical loss or damage to property caused by hurricanes, fires, wind damage or theft and is not designed to apply in the case of a virus.[7]

---

[7] https://www.thehartford.com/coronavirus/businesses (last viewed ____)

26.     In an article published by CNN[8], Christopher Swift, Hartford's Chief Executive Officer attempted to stymy lawsuits by attacking lawyers and claiming that their insureds were looking for a "rainy day fund":

> Ever since the pandemic began, some plaintiffs' attorneys have been pushing a false narrative, claiming that The Hartford and other insurance companies owe money to businesses shuttered by Covid-19 and we improperly refuse to pay. These lawyers want to turn our customers' carefully protected and managed premiums into an all-purpose rainy-day fund, which they were never intended to be. That's not how insurance works nor is it a realistic solution to this economic conundrum caused by the shutdowns….

## C.  Coverage for COVID-19-Related Losses Under Hartford's Commercial Property Policies

27.     Over the years, the insurance industry has developed specialty products for commercial property policies that include an express and specific grant of coverage for lost profits and other economic losses sustained when a business must either shut down or curtail its operations, including due to a pandemic. This category of coverage is sometimes called "time element" insurance—because the amount of loss usually depends on how long it takes to recover from the shutdown or slowdown and re-open.

28.     Hartford's policy contains several such coverages, of which two are the subject of this class action complaint: "Business Interruption" coverage and "Civil Authority" coverage. These coverages are part of a commercial property coverage but Hartford collects an additional premium for this coverage.

## BUSINESS INTERRUPTION COVERAGE

---

[8] https://www.cnn.com/2020/06/01/perspectives/the-hartford-ceo-insurance-coronavirus/index.html (last accessed November 10, 2020).

29.     The business interruption coverage is intended to cover the loss of "Business Income" sustained due to the necessary "Suspension" of an insured's "Operations" during a Period of Restoration."

30.     The policies' business interruption coverage provides, in relevant part:

> 5.   Additional coverages:
> o. Business income
> **(1)** We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or physical damage to property at the "scheduled premises", including personal property in the open (or in  vehicle) within 1,000 feet of the "scheduled premises", caused by or resulting from a Covered Cause of Loss.
>
> . . .
>
> **(5)** With respect to the coverage provided in this Additional Coverage, suspension means:
>
>> **(a)** The partial slowdown or complete cessation of your business activities; or
>>
>> **(b)** That part or all of the "scheduled premises" is rendered untentantable as a result of a Covered Cause of Loss if coverage for Business Income applies to the policy.

31.      The policies' extra expense coverage provides:

> 5. Additional coverages:
>  p. Extra Expense
> **(1)**     We will pay reasonable and necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no  direct physical loss or physical damage to property at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet, caused by or resulting from a Covered Cause of Loss.
>
> **. . .**
>
> **(4)**     With respect to the coverage provided in this Additional Coverage, suspension means:
>> **(a)**     The partial slowdown or complete cessation of your business activities; or

14

(b)    That part or all of the "scheduled premises" is rendered untentantable as a result of a Covered Cause of Loss if coverage for Extra Expense applies to the policy.

32.    Hartford used the phrase *"direct physical loss of or damage to"* property in its business interruption provisions. However, this phrase is not defined in in Plaintiffs' or Class Members' policies. Their policies also do not define the individual terms in that phrase—"*direct,*" "*physical*," "*loss*," and "*damage*."

33.    There is no accepted meaning of the phrase "direct physical loss of or damage to" property. Courts have given it varying and conflicting interpretations. For example, it has been applied by courts both to require and to deny coverage for losses of business income due to odors, asbestos, lead, mold, and the loss of electronic data.

34.    In addition, in construing the phrase "direct physical loss of or damage to" property, some courts have found coverage for the lost or reduced use or functionality of an insured's property without any demonstrable structural change or other physical alteration, while others, by contrast, have interpreted the same language as requiring a demonstrable structural damage or other physical alteration.

35.    As applied to COVID-19 and that virus's impacts on surfaces and objects, Hartford's use of the phrase "direct physical loss of or damage to" property in its commercial property policies is ambiguous. At best, it is subject to more than one reasonable interpretation; at worst, it has no plain meaning. Its ambiguity is underscored by the combination of several factors, including the following:

(a)    The absence of any definition of the phrase anywhere in the subject Hartford's commercial property policies;

(b)     The longstanding disagreements among courts about the meaning of the phrase—including disagreements about whether "loss" differs from "damage," whether one or both of those terms are modified by "physical," and whether the loss of a property's use, functionality, or reliability constitutes "direct physical loss of or damage to" property or whether, more narrowly, evidence of a demonstrable physical alteration of the property should be required;

(c)     The consistent and reasonable understanding of civil authorities, reflected in their official public statements, regarding the propensity of the virus to cause property loss or damage. Just as many civil authorities have, so too, a reasonable policyholder could understand the physical impacts of COVID-19 on surfaces and objects as physically damaging or otherwise causing losses to property—and, therefore, would reasonably have expected coverage;

(d)     The explicit admission by the American Association of Insurance Services, when the standard-form virus exclusion was introduced, in 2006, that its purpose was to "clarify" that "loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress is excluded." No such "clarification" would have been needed if policies without that language already clearly excluded coverage for viruses and pandemics; and

(e)     The obvious ease with which Hartford could have drafted its policy language to plainly express an intention to exclude coverage for viruses (or other pandemics) if it had intended to exclude them by, for example, simply including the ISO-standardized exclusion for viruses. Ambiguity was eminently avoidable here.

36.     The ambiguity in the phrase "direct physical loss of or damage to" property, as applied to the corona virus, must be construed against the drafter and, therefore, in favor of coverage.

**RLG's Business Interruption Losses**

37.     RLG is a North Carolina law firm with two offices in southeastern North Carolina. RLG's practice is limited to personal injury on a contingency fee basis.  The bulk of RLG's personal injury practice is automobile accidents and workers compensation claims.

38.     RLG sustained an immediate precipitous decline in new clients when the court system was essentially closed for personal injury litigation proceedings, which occurred on or about March 13, 2020.  See Exhibit M. Both Rodzik Law Firm locations shut down completely on April 9, 2020 and partially reopened on May 18, 2020.

39.     RLG's "Suspension" can be described among other ways, by discussing the impact of RLG's existing clients prior to the COVID 19 pandemic and separately the intake of new clients after the pandemic hit.

a.  With respect to existing clients' claims and cases, the North Carolina shutdown and restrictions caused a "Suspension" of the firm's business.  Most, if not all trials are being postponed until 2021.  Mediations and depositions have been cancelled or significantly delayed.  Insurance companies delayed processing claims. The Rodzik Law Group has been unable to resolve its personal injury cases in a timely fashion, resulting in a severe reduction of income and increased development and maintenance expenses.

b.  With respect to new cases, the businesses and industries, whose employees comprise Rodzik Law Group's workers compensation clients, suffered a

Suspension of Operations, thus destroying the Rodzik Law Group's workers compensation practice. In addition, the shutdown of businesses in and around the Rodzik Law Group's offices dramatically reduced vehicular traffic. Most of the Rodzik Law Group's personal injury cases stem from motor vehicle wrecks. Thus, the Rodzik Law Group suffered a tremendous downturn of motor vehicle claims and its income losses are ongoing.

40.     In addition to lost income, RLG sustained "Extra Expenses" during the Period of Restoration that it would not have incurred had there not been a "loss" at the "Scheduled Property." Rodzik Law Group has incurred Extra Expenses, including but not limited to, expenses for equipment, technology, and accounting services, that would not have otherwise been incurred without the suspension.

## BAU's Business Interruption Losses

41.     BAU's seminar marketing business has been devastated by the COVID-19 Pandemic. BAU's clients include estate attorneys, financial advisors and insurance agents who seek to attract clients through in person presentations. BAU's seminars are large events, for example at a nice restaurant where food is served, and BAU's clients make a presentation to prospective clients who have been treated to a fine dining experience.

42.     BAU's seminars take about 5 weeks to organize. After initial consultations with their client, BAU prepares and mails written materials inviting prospective attendees to the event. The mailings request the potential attendees call and register for the event. BAU undertakes all intake and scheduling and then runs the event at, for example, a Ruth Chris' restaurant.

43.     After the pandemic hit, BAU's customers cancelled their scheduled seminars and new business has been non-existent, and because of many governmental orders, impossible to undertake.

## Cataract Consultant's Business Interruption Losses

44.     Cataract Consultant's ophthalmological practice was also devastated by the COVID-19 pandemic and resulting orders. Numerous directives and orders were issued by the Governor of North Carolina, American Academy of Ophthalmology (AAO), College of Surgeons, New Hanover Regional Medical Center, and SurgCare facilities beginning in March 2020 in an attempt to reduce or prevent the spread of COVID-19.  This resulted in a significant number of cancellations and a decline of business operations. From March 20 through June 1, 2020, Cataract Consultants PA was prohibited from conducting any elective procedures or examinations.  The practice's access to operating room facilities were also temporarily suspended by these directives and orders. Because the surgeries that it regularly performs is deemed elective surgery, Cataract Consultant was forced to cease its primary source of business- cataract surgeries.

45.     Even when it was allowed to begin surgical procedures, Cataract Consultant has faced numerous obstacles and slowdowns.  Rather than perform surgical procedures in New Hanover County, because of capacity restrictions, Cataract Consultant has been forced to perform surgery in Pender County, which is logistically very difficult for the company and its patients.

## Hartford's Denial of Business Interruption coverage

46.     Each of the Plaintiffs submitted written claims to Hartford.  Hartford has denied each claim, See Denial letters Exhibits F (RLG), G (BAU) and H (Cataract Consultants).

47.     Basically, Hartford has rejected each claim and those of the Class because they have determined the coronavirus did not cause physical loss or damage to covered property at the

insured's place of business or in the immediate area, as a result of a covered cause of loss. In addition, Hartford asserts that numerous exclusions, including the "pollution" exclusion and exclusion of "consequential loss," prevents coverage. Finally, Hartford claims that the limited Fungi, Bacteria or Virus coverage does not afford coverage for the Plaintiffs' losses.

## Civil Authority Coverage

48.     The policies' Civil Authority Coverage provides:

> 5. Additional coverages:
>    q. Civil Authority
>    (1) This insurance is extended to apply to the actual loss of Business Income you sustain when access to your "scheduled premises" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your "scheduled premises".
>
>    (2) The coverage for Business Income will begin 72 hours after the order of a civil authority and coverage will end at the earlier of:
>
>       (a) When access is permitted to your "scheduled premises"; or
>
>       (b) 30 consecutive days after the order of the civil authority.

49.      Numerous governmental orders, decrees and more substantially impacted the Plaintiffs' and the Class' Operations.

50.     These Orders and decrees have prevented Plaintiffs and the Class from being able to use their property for its intended business uses or access their business for conducting their business operations.

51.     The Orders and decrees are tantamount to physical loss or damage to property.

52.     Nonetheless, in its denial letters Hartford has rejected coverage.

## The Limited Fungi, Bacteria or Virus Endorsement

53.     The Plaintiffs' policies contain an endorsement, headed "Limited Fungi, Bacteria or Virus Coverage," (SS 40 93 07) which adds limited fungi, bacteria or virus coverage to the

policy. The Endorsement is described under the heading "Stretch Coverages," and the following language: "This form includes many additional coverages and extensions of coverages." The identical language appears throughout the policies. (See pages 13, 15, and 17 of Exhibit B; see page 16 of Exhibit C-1; see page 17 of Exhibit C-2; and see pages 15 and 17 of Exhibit D.)

54. Hartford claims that this endorsement fails to provide and, in fact, precludes coverage for Plaintiffs' losses.

55. Importantly, the endorsement adding virus coverage is not delineated in the Exclusion provisions set forth in the policy (see pages 48-50 of Exhibits B and D; pages 45-47 of Exhibit C-1; and pages 46-48 of Exhibit C-2). Thus, the Endorsement may not reasonably be interpreted to be an exclusion to the all-risk policy.

56. The Endorsement expressly applies to the Special Property Coverage Form contained in the policy. It adds in the word "virus" at the end of the standard provision in Hartford policies that had applied to "'Fungi,' Wet Rot, Dry Rot and Bacteria."

57. In the Endorsement, the term "virus" is grouped with non-disease-causing agents, including "wet rot" and "dry rot." The Endorsement therefore is most reasonably understood to limit recovery only for injuries caused by viruses that are akin to rot, and not to limit recovery for injuries caused by COVID-19.

58. Subsection C of the Endorsement defines "fungi." Neither the policy nor the Endorsement defines "virus."

59. Subparagraph B.1.a. of the Endorsement states that the coverage described in subparagraph B.1.b of the policy--which includes loss or damage caused by virus--applies when such loss or damage is the result of a "specified cause of loss" other than fire or lightning. The

Endorsement neither defines nor refers to any section of the policy defining "specified cause of loss."

60.     Subparagraph B.1.b of the Endorsement states that "We will pay for loss or damage by "fungi', wet rot, dry rot, bacteria and virus."

61.     Subparagraph B.1.f of the Endorsement specifically includes coverage for injury caused by virus: it provides for up to 30 days of coverage if "loss or damage to property caused by . . . virus causes a suspension of operations and if "Time Element Coverage" applies. "Time Element Coverage" is a term of art in the insurance industry referring to coverages measured in time, including Business Interruption and Civil Authority coverages.

62.     The Endorsement providing for limited fungi, bacteria or virus coverage and the effect of its interaction with the underlying policy are so complicated and convoluted that they should not be interpreted to exclude coverage for lost business income related to the coronavirus. That is particularly true given ISO's promulgation in 2006 of an unambiguous Exclusion entitled Exclusion of Loss Due to Virus or Bacteria. Hartford could have expressly and unambiguously excluded such coverage by including that Exclusion in its policy. It did not do so.

## CLASS ALLEGATIONS

Pursuant to Rule 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, Plaintiffs bring this action individually and on behalf of the following similarly situated classes (the "Classes"):

### Business Income Class

All persons and entities that: (a) had Business Income and Extra Expense coverage under a commercial property insurance policy without a virus exclusion issued by Defendants; (b) suffered a suspension of their operations related to the coronavirus epidemic or any civil authority

22

order related to COVID-19 at the scheduled premises covered by their commercial property insurance policy or at another property that impacted the scheduled property covered by their commercial insurance policy and (c) made a claim under their property insurance policy issued by Defendants; and (d) were denied coverage by Defendants.

**Extended Business Income Class**

All persons and entities that: (a) had Extended Business Income coverage under a commercial property insurance policy without a virus exclusion issued by Defendants; (b) suffered a suspension of their operations related to the coronavirus epidemic or any civil authority order related to COVID-19 at the scheduled premises covered by their commercial property insurance policy or at another property that impacted the scheduled property covered by their commercial insurance policy and (c) made a claim under their property insurance policy issued by Defendants; and (d) were denied coverage by Defendants.

**Business Income from Dependent Properties Class**

All persons and entities that: (a) had Business Income from Dependent Properties coverage under a commercial property insurance policy without a virus exclusion issued by Defendants; (b) suffered a suspension of their operations related to the coronavirus epidemic or any civil authority order related to COVID-19 at the scheduled premises covered by their commercial property insurance policy or at another property that impacted the scheduled property covered by their commercial insurance policy and (c) made a claim under their property insurance policy issued by Defendants; and (d) were denied coverage by Defendants.

**Civil Authority Class**

All persons and entities that: (a) had Civil Authority coverage under a commercial property insurance policy without a virus exclusion issued by Defendants; (b) suffered a suspension of their

operations related to the coronavirus epidemic or any civil authority order related to COVID-19 at the scheduled premises covered by their commercial property insurance policy or at another property that impacted the scheduled property covered by their commercial insurance policy and (c) made a claim under their property insurance policy issued by Defendants; and (d) were denied coverage by Defendants.

63.     Specifically excluded from these definitions are (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; (3) Class Counsel.; and (4) insureds who failed to comply with applicable provisions of their policies, such as the payment of premiums.

64.     Plaintiffs reserve the right to amend the Class definitions above or add appropriate subclasses following discovery.

65.     This action is brought and may be properly maintained as a class action.

66.     Numerosity: Although the exact number of Class Members is uncertain at this time and can only be ascertained through discovery, the number is great enough such that joinder is impracticable.   The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.

67.     Typicality: The claims of the representative Plaintiffs are typical in that Plaintiffs, like all Class Members, purchased Commercial Property Insurance from the Defendants which should have provided coverage, but Defendants denied coverage.  All the claims are based upon the same underlying facts, events, and circumstances.

68.     Commonality: This action involves common questions, which predominate over questions affecting individual members of the Classes, including (without limitation):

a. Are the terms of coverage for property losses in the subject policies – namely, coverage for "direct physical loss or damage"—ambiguous as applied to COVID-19?

b. Does the *Business Income, Extended Business Income and Business Income from Dependent Properties* coverage in the subject policies provide coverage for the COVID-19-related property losses sustained by Plaintiffs and Class Members?

c. Does the *Civil Authority* coverage in the subject policies provide coverage for the COVID-19-related property losses sustained by Plaintiffs and Class Members?

d. Has Hartford breached or repudiated its coverage obligations by denying Plaintiffs' and Class Members' claims for coverage for COVID-19-related property losses?

e. By not inspecting their properties, has Hartford waived any right to inspect Plaintiffs' or Class Members' properties, deny coverage for any reason related to conditions at their properties, or raise any defense related to conditions or facts specific to a property?

f. By denying Plaintiffs' and Class Members' Claims, has Hartford breached its duty of good faith and fair dealing or violated North Carolina's rules and regulations governing fair claims handling, including N.C. Gen. Stat. § 58-63-15(11)?

69. <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class

actions, including insurance coverage and consumer actions, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no interests incompatible with the Classes.

70. <u>Predominance and Superiority:</u> Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Further, absent a class action, the litigation will be plagued by inconsistent judgments on identical issues. The court's resources will be more judicially exercised by class treatment.

71. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class appropriate.

**FIRST CLAIM FOR RELIEF**
**Declaratory Judgment**
**(By Plaintiffs and all Classes)**

72. Plaintiffs hereby reallege and incorporate by reference all allegations raised in the preceding paragraphs as if fully stated herein.

73. Plaintiffs bring this claim against Defendants individually and on behalf of the members of the Business Income Class, the Extended Business Income Class and Business Income from Dependent Properties Class.

74. Plaintiffs' policies, as well as those of the members of the Business Income Class, the Extended Business Income Class and Business Income from Dependent Properties Class are contracts under which premiums were paid to Defendants in exchange for promises to pay losses for claims covered by their insurance policies.

75.     Plaintiffs and the members of the Business Income Class, the Extended Business Income Class and Business Income from Dependent Properties Class have complied with all applicable provisions of the policies.

76.     Defendants have uniformly and wrongly denied claims related to a suspension of their operations related to the coronavirus epidemic or any civil authority order related to COVID-19 at the scheduled premises.

77.     An actual case or controversy exists regarding Plaintiffs and Business Income Class, the Extended Business Income Class and Business Income from Dependent Properties Class Members' rights and Defendants' obligations under the policies to provide reimbursements for the full amount of losses incurred by Plaintiffs and the Business Income Class, the Extended Business Income Class and Business Income from Dependent Properties Class Members in connection with the coronavirus epidemic or any civil authority order related to COVID-19 at the scheduled premises.

78.     Pursuant to 28 U.S.C. § 2201, Plaintiffs and the Business Income, the Extended Business Income Class and Business Income from Dependent Properties Class Members seek a declaratory judgment from this Court declaring the following:

    a.  The language in the subject Hartford policies, promising coverage for "direct physical loss of or damage to" covered property —and likewise the same operative language in any other Hartford Insurance policy—is ambiguous, and that ambiguity must be construed against Hartford and in favor of coverage.

    b.  Because the term "direct physical loss or damage to" property is ambiguous, the Business Income and Extra Expense coverage should be interpreted to cover COVID-19-related property losses.

c.  Because the term "direct physical loss or damage to" property is ambiguous, the Civil Authority Coverage provided by the subject Hartford policies should be interpreted to cover COVID-19 related property losses.

d.  Hartford has waived any right to inspect Plaintiffs' or Class Members' business premises, deny coverage for any reason related to conditions at their business premises, or raise any defense related to conditions or facts specific to the premises.

e.  Hartford is obligated to pay Plaintiffs and members of the Business Income Class, Extended Business Income Class and Income from Dependent Properties Coverage Class for all Business Income and Extra Expense losses (up to policy limits), resulting from the interruption of their businesses due to COVID-19.

f.  Hartford is obligated to pay Plaintiffs and members of the Civil Authority Coverage Class for all Business Income and Extra Expense losses (up to policy limits), resulting from the interruption of their businesses due to COVID-19.

79.  Plaintiffs and the Class also seek injunctive relief compelling Hartford to:

a.  Provide notice to all policyholders that Business Income and Extra Expenses losses resulting from the interruption, suspension, or curtailment of their businesses due to COVID-19 or the related orders of civil authorities, or the contamination of their property or suspicion of contamination of their property due to COVID-19 or civil authority orders, are covered losses which, if claimed, will be eligible for payment (up to policy limits).

b.  Pay Plaintiffs and all Class Members (of all classes) for all Business Income and Extra Expenses losses they have sustained (up to policy limits), resulting from: (i) the suspension, interruption, or curtailment of their businesses due to COVID-19

or the related orders of civil authorities; or (b) the contamination, or suspicion of contamination, of their property due to COVID-19 or the related orders of civil authorities.

## SECOND CLAIM FOR RELIEF
**Breach of Contract- Business Interruption, Extended Business Interruption and Dependent Properties Coverage**
**(By Plaintiffs and all Classes)**

80.    Plaintiffs hereby reallege and incorporate by reference all allegations raised in the preceding paragraphs as if fully stated herein.

81.    Plaintiffs' and Class Members' commercial property policies issued by Hartford are contracts.

82.    Pursuant to their policies, Plaintiffs and Class Members paid premiums to Hartford, in exchange for Hartford 's promise to indemnify Plaintiffs and Class members for covered losses due to business interruptions.

83.    Plaintiffs have complied with all applicable obligations under their insurance contracts.

84.    By its conduct, as alleged above, Hartford has breached its contractual obligations to Plaintiffs and to all Class Members to provide them Business Interruption coverage, Extended Business Income coverage and Income from Dependent Properties coverage causing them substantial damages.

## THIRD CLAIM FOR RELIEF
**Breach of Contract- Civil Authority Coverage**
**(By Plaintiffs and all Classes)**

85.    Plaintiffs hereby reallege and incorporate by reference all allegations raised in the preceding paragraphs as if fully stated herein.

86. Plaintiffs' and Class Members' commercial property policies issued by Hartford are contracts.

87. Pursuant to their policies, Plaintiffs and Class Members paid premiums to Hartford, in exchange for Hartford 's promise to indemnify Plaintiffs and Class Members for covered losses due to business interruptions.

88. Plaintiffs have complied with all applicable obligations under their insurance contracts.

89. By its conduct, as alleged above, Hartford has breached its contractual obligations to Plaintiffs and to all Class Members to provide them Civil Authority coverage causing them substantial damages.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, prays for relief against Defendant, as follows:

1. For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel.

2. For a judgment awarding the declaratory and injunctive relief sought herein.

3. For a judgment awarding Plaintiffs and all members of the Business Income Class, Extended Business Income Class and Income from Dependent Properties Coverage Class full contract damages for Hartford's breaches of their insurance contracts.

4. For an award of attorney's fees to the extent allowed by law.

5. That costs and expenses of this action be taxed against Defendants;

6. For pre-judgment and post-judgment interest on all amounts awarded;

7. For trial by jury on all issues so triable; and

8.  For such other relief that the Court finds just and proper.

This the 20th day of November, 2020.

Respectfully submitted,

**Rhine Law Firm, P.C.**

*/s/ Joel R. Rhine*
Joel R. Rhine, NCSB No. 16028
jrr@rhinelawfirm.com
Martin A. Ramey, NCSB No. 33617
mjr@rhinelawfirm.com
1612 Military Cutoff Road, Suite 300
Wilmington, NC 28403
Phone: (910) 772-9960
Fax: (910) 772-9062
*Counsel for Plaintiffs and the Proposed Class*

Jay Angoff*
jangoff@findjustice.com
Cyrus Mehri
cmehri@findjustice.com
Joshua Karsh
jkarsh@findjustice.com
Ezra Bronstein*
ebronstein@findjustice.com
MEHRI & SKALET, LLC
1250 Connecticut Ave NW, Suite 300
Washington, DC 20036
Phone: (202) 822-5100
*pro hac vice anticipated*

Gary M. Klinger
gklinger@masonllp.com
MASON LIETZ & KLINGER LLP
227 West Monroe St., Ste. 2100
Chicago, IL 60606
Tel.: 312-283-3814

Gary E. Mason*
gmason@masonllp.com
Danielle L. Perry*
dperry@masonllp.com
MASON LIETZ & KLINGER LLP

31

5101 Wisconsin Ave., NW Ste. 305
Washington, DC 20016
Tel.: 202-429-2290
Fax.: 202-429-2294
*pro hac vice anticipated*

Jonathan Shub
jshub@shublawyers.com
Kevin Laukaitis, Esq.
Klaukaitis@shublawyers.com
SHUB LAW FIRM LLC
134 Kings Hwy. E.
2nd Floor
Haddonfield, New Jersey 08033
Phone: 856-772-7200